UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

Dylan Frey Tuttle and                    Case No. 16-28259-beh
Madison Elizabeth Zuverink,

            Debtors.                      Chapter 7

Dylan Frey Tuttle,

            Plaintiff,

v.                                        Adversary No. 17-02116

Educational Credit Management
Corporation,

            Defendant.

## DECISION ON PLAINTIFF'S ADVERSARY COMPLAINT

The debtor seeks to have his student loans, consolidated in 2001,
discharged because he asserts that continued repayment would constitute an
undue hardship. After obtaining a bachelor's and Master's degree, being
employed and then self-employed for 19 years, the debtor ended his new job
search in early 2016 after six weeks to stay home to care for his ailing parent,
and then for his young child. As part of its argument against undue hardship,
the lender seeks a determination that a trust, established by the debtor's
mother shortly before her death in 2017, creates an income stream for the
debtor's benefit and not strictly for the benefit of the settlor's grandchildren.

Applying the *Brunner* test, in light of *Krieger v. ECMC*,[1] the Court holds that repayment of this debtor's student loans does not constitute such an undue hardship as to make that obligation dischargeable under 11 U.S.C. § 523(a)(8). The Court also interprets the trust settlor's intent to have set aside funds for her grandchildren's education, not the education of her 46-year old son, and so those funds are not available to the debtor for the repayment of his student loans or his other living expenses.

## FACTS

### Procedural History

Plaintiff, Dylan Frey Tuttle, is a married father of one. Mr. Tuttle, (dba Vulkans Forge Consulting Ltd, dba Weestack LLC) and his wife, Madison Zuverink, filed a Chapter 7 bankruptcy petition on August 18, 2016 and were granted a discharge on November 28, 2016.[2] On April 27, 2017, the Court granted Tuttle's motion to reopen his case to file an adversary complaint to determine the dischargeability of his student loans. Tuttle's *pro se* complaint asserts that excepting his student loan debt from discharge will impose an undue hardship on the debtor, his wife, and their young son.

The original defendant was Navient Solutions, Inc. On June 9, 2017, the Court granted Education Credit Management Corporation's ("ECMC") motion to substitute ECMC as a party defendant for Navient. ECMC is a not-for-profit Minnesota corporation that administers and guarantees the Federal Family Education Loan Program ("FFELP"). ECMC also provides specialized guarantor services to the Department of Education and other FFELP guaranty agencies, including accepting transfer of title to certain student loan accounts on which

---

[1] The Seventh Circuit follows the *Brunner* test when evaluating undue hardship from student loans. *In re Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993) (citing *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987). More recently the Court, in *Krieger v. Educ. Credit Mgmt. Corp.*, 713 F.3d 882,884 (7th Cir. 2013), warned against allowing the judicial glosses of language in *Roberson* and *Brunner* to supersede the text of the statute itself.

[2] The Court takes judicial notice of the filings in Tuttle's bankruptcy case, 16-28259. *In re Cross*, Case No. 17-20977, Adv. No. 17-2153 2018 WL 3965191, at *3 (Bankr. E.D. Wis. Aug. 16, 2018) (citations omitted).

the student loan borrower has filed a bankruptcy proceeding. ECMC accepted the transfer of all right, title and interest in Tuttle's consolidated loan from its original guarantor. Exhibit 104.

After several months of discovery and discovery-related motions, the Court held a trial, with testimony from Mr. Tuttle and Ms. Kerry Klitsch of ECMC. Thereafter, the Court set a post-trial briefing schedule,[3] and took the matter under advisement.[4]

## Jurisdiction

The Bankruptcy Court for the Eastern District of Wisconsin has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This proceeding is a core matter in which this Court has constitutional authority to enter final orders under 28 U.S.C. § 157(b)(2)(I).

## FINDINGS OF FACT

### Education and Employment History

Mr. Tuttle testified as to his family background and educational opportunities. His mother was from Costa Rica, and his father from the United States. They separated when he was age 11, as an only child. He and his mother lived in a Chicago apartment, and he attended public high school while she worked as a housekeeping supervisor at a hospital. They lived modestly, and he "did not have a lot of guidance regarding schooling or a career." He incurred student loan debt for his tuition and expenses at Shimer College in Chicago, where he received a Bachelor's Degree in 1994. He also assumed

---

[3] Defendant ECMC filed a motion asking the Court to strike a table appearing on page 4 of the debtor's reply brief and Mr. Tuttle objected. *See* CM-ECF Doc. Nos. 79, 82. The Court grants the motion as to the table in the reply brief, only to the extent it offers as "facts" information about expenses beyond evidence presented at the trial, such as exhibit 6, or in documents of which the Court can take judicial notice, such as the debtors' schedules.

[4] Shortly after the trial concluded, and again during post-trial briefing, the debtor filed requests to correct his testimony as to certain dates in his work history and his loan repayment history, and regarding some potential graduate work over 10 years ago, CM-ECF Doc. Nos. 68, 74. The Court denies written requests to add evidence to the trial record, but also notes that Exhibits 41, 43, 104-06, describing the debtor's loan history, are part of the Court record.

student loan debt while studying at the London School of Economics, where he received a Master's Degree in Political Sociology in 1996.

After completing his formal education, Mr. Tuttle worked in options trading between 1997 and 2005. He first served an internship learning the options trade in 1997, then as a clerk at the Chicago Mercantile Exchange in 1998. After that he worked as a clerk for a trader at the Board of Options Exchange, working on a joint account for over a year, into 1999. For the next several years he traded off and on, sometimes for his own account and sometimes for another's account. When the exchange transitioned from floor to electronic trading, Tuttle was unwilling to incur more debt to obtain a Master's degree in quantitative finance and thereby participate in electronic trading, so he accepted a severance package as his department downsized. He drove a cab at night in 2006. After leaving trading, he volunteered for a small business development corporation, and then worked in economic development programming, developing programs for managers and small business owners. During this period, he also took 30 credits of coursework in economics and accounting at the local technical school, without borrowing for tuition and in an effort to improve his employment prospects. Exhibit 42. After being denied a promotion, he started his own business in 2011, around the same time he got married. He worked in Chicago during the week, sleeping in his office, and coming to Milwaukee on weekends to be with his wife. While trying to make a go of his grant-writing training business, Tuttle successfully completed a Phase I SBIR award (small business innovation research program through the National Science Foundation) but did not progress further as he was unable to secure significant investor commitments. As he said, "By then it was December, 2015, and he was running out of options and realized the business was not going to work and was not sustainable." He also testified "his wife humored him for awhile and then said he had to get real and move on."

Mr. Tuttle has generated no monthly income since October 2015. He testified that because it took so long for the business to become "cash flow positive" he could not make payments on his educational loans after January

6, 2012. His job search between the weeks of November 21, 2015 and January 9, 2016 was unsuccessful. He then ceased his search, because his mother became terminally ill and shortly thereafter his wife became pregnant. Exhibit 34. He converted his Illinois S-Corporation into a Wisconsin LLC (Weestack, LLC) with the intention of running the business from home. Exhibit 4. That business never produced revenue.

After finding local daycare costs to be almost $1,000/month, Exhibit 48, and considering Mr. Tuttle's irregular income over time, Exhibit 44, and work history, Tuttle testified he and Ms. Zuverink decided that he should care for their child full-time, stating "it is plausible that our children will be better off with a parent at home." As part of this decision, he testified he also considered the fact of his "low-income background" and his perception of its effect on his employability. He testified that his career history of lack of advancement and lack of supervisory experience, by mid-life, were also factors in his conclusion that he was not readily employable. He did not specify for which types of employment he based this conclusion.[5] He and his wife filed their Chapter 7 bankruptcy case in August, 2016, several months before their child was born.

Their child is now a healthy two-year-old, and both Mr. Tuttle and Ms. Zuverink are healthy and ages 46 and 32, respectively.

### Loan Repayment History

Mr. Tuttle's initial student loans totaled $39,088, including Stafford Subsidized, Stafford Unsubsidized, and Federal Perkins loans. Exhibit 40. His loans entered repayment in 1997. Tuttle repaid his Perkins Loans ($5,000) by August, 2000, during the time he was working in options trading. Exhibit 10. On January 10, 2001, Tuttle executed a Federal Consolidation Loan Application and Promissory Note created pursuant to FFELP. Tuttle's consolidation loan of his Stafford Loans was disbursed on January 22, 2001 in the amount of $41,871.56, including capitalized interest, with a repayment

---

[5] In his post-trial reply brief, Tuttle tried to give additional rationale for the decision to stay out of the job market and provide childcare to their son, but that additional rationale is not trial testimony under oath and subject to cross-examination, and will not be considered.

period of 25 years. Exhibit 49, Response 9. ECMC now holds title to the consolidation loan. To date, Tuttle has made 104 payments on his FFELP consolidation loan in the total amount of $34,198.59, of which $4,799.84 was applied to principal. Since he consolidated his Stafford Loans, Exhibit 10, he has taken nine periods of deferment or forbearance, totaling 87 months between January 1, 2003 and May 4, 2017.[6] Exhibit 49, Response 11. During that same period, he had several employers, some unemployment, and had also been an entrepreneur.

These periods of deferment and forbearance have resulted in capitalization of interest. Thus, as of the time of trial in late summer, 2018, his consolidated loan had a balance due of $59,640.19. Exhibit 105. His updated payment schedule, issued January 22, 2017, requires 196 monthly payments: $368.50 for five months beginning April 2, 2017, increasing to $504.90 for 190 months, and one final payment of $502.66 if the loan were to be paid off by July 2033. Exhibit 41. Tuttle has avoided default on his student loan debt.

Loan repayment options have changed over the time since Mr. Tuttle first entered repayment. Presently, he has not elected to participate in any repayment plans offered by the William D. Ford Direct Loan Program. Ms. Klitsch described the Standard Repayment Plan, Graduated Repayment Plan, Extended Repayment Plan, Income Contingent Repayment Plan ("ICRP"), Income-Based Repayment Plan ("IBR"), and Revised Pay as You Earn Plan ("REPAYE") (collectively, the "Ford Program"). *See* 20 U.S.C. § 1087a., 34 C.F.R. §§ 685.208-209; Exhibit 107. Tuttle contended that if he accepted a current offer for IBR, it would mean "accepting a new direct consolidation loan with a maximum repayment period of 25 years under standard or graduated repayment plans, and that he would have lost credit for any payments made toward income-driven repayment plan forgiveness." CM-ECF Doc. No. 54, at 10.

---

[6] The debtor's post-trial brief asserts 59 months of deferment and 32 months of forbearance. CM-ECF Doc. No. 76, at 13, Exhibit 20.

He also argues, somewhat conversely, that "the possibility of loan forgiveness also implies a potential nondischargeable tax liability, and the debt would be reported to credit bureaus for the life of the loan, negatively impacting our household's ability to build assets." CM-ECF Doc. No. 72, at 15, ¶ 45.

### Income and Expenses

When the debtors commenced their Chapter 7 in August, 2016, they listed over $64,000 in credit card debt on Schedule E/F. Case No. 16-28259, CM-ECF Doc. No. 1, at 25-26. That debt has since been discharged, and Mr. Tuttle asserts he has incurred no new debt.

They also listed student loan debt totaling $49,339 for Mr. Tuttle and $37,693 for Ms. Zuverink. *Id.* at 27-29. Tuttle stated that by March 8, 2017, after filing his adversary complaint, the unpaid principal on his consolidated student loans was $53,600. The debtors own no real property. On Schedule A/B, the debtors denied any interest in any trust or in any property due from someone who had died, *id.* at 17-18, but under "contingent and unliquidated claims" stated "remainder beneficiary of a revocable trust (undetermined value)," *id.* at 19. The debtors listed $10,064.00 of personal property, including a (now) 18-year-old car. Tuttle was listed as unemployed "member/owner," and Ms. Zuverink worked as a research assistant for the local medical school. *Id.* at 36. At the time of filing, the debtors' combined monthly income was $1,424.65, based on a monthly business loss to Tuttle of $231.28, and Ms. Zuverink's net monthly wages of $1,655.93, with the notation "the home business should be cash flow positive within a year." Schedule J showed net monthly income of negative $100.35, with the notation that they were expecting a child in December or January. *Id.* at 40.

Describing the prior two years, Mr. Tuttle reported that his gross income from operating a business in calendar year 2015 was $31,693.00, and $28,945.00 in calendar year 2014. *Id.* at 43. The household's adjusted gross income over the last several years has ranged from a high of $68,049 (in 2013) to a low of $27,245 (in 2016). Exhibit 101. The debtors' tax returns for 2015,

2016 and 2017 showed an average federal tax refund of $6,481.00, although these were not accounted for on Schedule I. Exhibit 100. The Chapter 7 panel trustee held a meeting of creditors and a continuance of that meeting, at which both debtors appeared. The trustee issued her Report of No Distribution (no asset report) on October 13, 2016. The debtors received their discharge in November 2016.

Mr. Tuttle testified that his wife recently defended her Ph.D. thesis in microbiology and was scheduled to receive her Ph.D. in late 2018. According to Tuttle, at the time of trial Ms. Zuverink was applying for post-graduate fellowships and as a consequence the family might be required to move to Toronto. Tuttle testified that his wife is likely to earn between C$40,000 and C$45,000, or an average of C$42,500 for the years of any fellowship in Toronto (or elsewhere in Canada). The foreign currency exchange rate, as of the date of this decision, is C$1.3620 to $1.00 USD. *See* https://www.fiscal.treasury.gov/reports-statements/treasury-reporting-rates-exchange/current.html That means a Canadian salary of $42,500 would be approximately $31,204.00 USD.

Mr. Tuttle and/or his family have received benefits from the Wisconsin Home Energy Assistance program, Froedtert and the Medical College of Wisconsin's Financial Assistance Program, BadgerCare Plus insurance for their child, WIC Wisconsin, and a local church food pantry.

ECMC disputes the accuracy and necessity of a number of Mr. Tuttle's currently claimed expenses. Schedule J, dated August 18, 2016, listed $1,525 in total expenses. Tuttle testified that he merely estimated their Schedule J expenses based on a budget he created during mandatory credit counseling. As such Schedule J was not based on actual expenses but rather on a discussion that he had with his wife prior to adding a child to their household and he failed to budget for several categories of expenses. Tuttle testified that his household monthly expenses for January to June 2017 (five months after he filed his Schedule J) were $3,210.69, for their household of three. He

submitted this list of revised expenses to ECMC in discovery and offered it at trial as Exhibit 6.

ECMC argued that certain claimed expenses were unduly high for a "thrifty lifestyle": $258.10 in monthly healthcare for three healthy family members, $262.53 monthly for "electronics and merchandise" and $253.37 in transportation and car insurance expenses (versus the $173 listed on Schedule J). ECMC argued that Tuttle improperly took the car expense figure from a consumer survey, Exhibit 7, instead of basing it on the debtors' actual household expenses.

In response, Mr. Tuttle testified that the "electronics and merchandise" category includes online purchases, such as the second-hand clothing and books his wife buys for herself and their child. In his interrogatory response he agreed some of the $527.34 expense under "Weestack LLC," his home business, was no longer applicable, as it originally reflected the wind-down expenses for his first business, Vulkans Forge Consulting, but in his reply brief he agreed that the business had ended. He acknowledged that $152.19 per month for restaurant expense was "more than we would like, but convenience and social obligations occasionally win out." He also expected household income to decline after his wife obtains her Ph.D., because Social Security and Medicare were not withheld while his wife was a graduate student, and will be withheld in future. He did not estimate those deductions. If Ms. Zuverink accepts a fellowship in Toronto and the family moves, Tuttle expects some increased expenses. He did not identify those expenses. Exhibit 6 does not include any student loan payment for Tuttle, which, as Ms. Klitsch testified, if he does not enter into a new deferment or new IBR arrangement, would be between $469 to $555 per month. *See* Exhibit 41.

### The Trust

Mr. Tuttle also provided a copy of the July 22, 2016 Miriam Guillermina Carrillo Living Trust (the "Trust"), which his mother established and of which he is, by virtue of his mother's passing and the terms of the trust document,

now the sole trustee.  CM-ECF Doc. No. 59-2, at 2.  Exhibit 101, Sec. 4.  The Trust's balance was $38,305.87 as of February 8, 2018.  *Id.* at 14.  Exhibit 102.

Several sections of the Trust are relevant to the Court's analysis. Sections 2, 4, and 5 of the document describe the Trust property, the appointment of trustees (including Mr. Tuttle), and the powers and duties of those trustees:

> 2.  TRUST PROPERTY
>
> The Grantor [Miriam Guillermina Carrillo] declares that he or she has set aside and caused the transfer of all of his or her right, title, and interest in and to the property described in Schedule A to the Trust (together with any other property added to the Trust, the "Trust Property") for the use, benefit, and enjoyment of the beneficiaries named herein. . . .
>
> . . .
>
> 4.  APPOINTMENT OF TRUSTEE
>
> (a)  Miriam Guillermina Carrillo and Dylan Frey Tuttle will be the co-trustees of the Trust, with all of the rights, privileges, and responsibilities set forth herein. If one of the co-trustees resigns or cannot serve due to death, disability, or incapacity, the other trustee shall continue as the sole trustee of the Trust, and each subtrust of the Trust, if any . . . .
>
> (b)  If at any time both Miriam Guillermina Carrillo and Dylan Frey Tuttle resign or cannot serve due to death, disability, or incapacity, Madison Elizabeth Zuverink will be the successor trustee. . . .
>
> . . .
>
> 5.  POWERS AND DUTIES OF TRUSTEE
>
> . . .
>
> (b)  <u>Specific Powers</u>.  In furtherance of subsection (a) above, the powers of the trustee include, but are not limited to, the powers to:
>
>> . . .
>>
>> 16)  On the death of the Grantor, pay any just debts and expenses of the Grantor.

*Id.* at 1–4.

Sections 6 and 8 of the Trust set forth the beneficiaries of the Trust and certain conditions of distribution, stating in relevant part:

> 6.  BENEFICIARIES
>
> Subject to the creation of any subtrusts, on the death of the Grantor, the trustee shall allocate or distribute the remaining Trust Property to the beneficiaries named below, after the payment of any just debts, funeral expenses, trust and estate administration expenses, and estate taxes:
>
> . . .

(b)  Residual Assets. After all specific bequests have been made, the residual Trust Property will be distributed to the following beneficiaries in the percentages set forth below:

    1)  Name: Dylan Frey Tuttle
    Percentage: 100%

    If such beneficiary is not then living, that share of the Trust Property that would have been given to such beneficiary will be distributed to Dylan Frey Tuttle's children then living in equal shares.

. . .

8.  SUBTRUSTS

(a)  Creation of Subtrusts. The Grantor directs that each beneficiary designated below will receive his or her share of the Trust Property under those conditions made specifically applicable to such beneficiary and in accordance with the provisions set forth in this section:

    1)  The Trust Property distributed to Dylan Frey Tuttle will be retained in trust and held in a separate subtrust of the Trust until: Dylan Frey Tuttle's death.

(b)  Authority of Trustee to Continue Trust. The trustee shall hold in a subtrust of the Trust those assets that are to be distributed to the beneficiaries named in subparagraph (a) above. Each subtrust may be identified by adding the name of the beneficiary to the Trust.

(c)  Distribution Provisions. The trustee shall distribute, in convenient installments to or for the benefit of a beneficiary, so much of the net income and principal of the beneficiary's trust share as the trustee deems necessary, in the trustee's discretion, for the health, education, maintenance, and support of said beneficiary. Education includes, but is not limited to, college, graduate school, vocational studies, and reasonably related living and travel expenses.

    1)  In exercising any power concerning discretionary payments of income or principal to or for the benefit of the beneficiary of any trust under this Declaration, the trustee shall consider other income or resources of the beneficiary known to the trustee and the trustee may rely on the written statement of the beneficiary about such other income or resources.

*Id.* at 6–7.

Finally, section 10 of the Trust contains the following miscellaneous provisions:

10.  MISCELLANEOUS

(a)  Physical Segregation of Trust Shares Not Required.  If more than one trust is created under this Declaration, the trustee is not required to physical segregate or divide the assets of the various trusts, except if physical segregation or division is required on the termination of any of the trusts.

. . .

(e)  Payments to Minor Beneficiaries.  The trustee may make distributions of a minor's trust share, up to the whole thereof, to the guardian of the minor's person or a custodian for the minor under state law, or may apply distributions directly for the minor's benefit.

. . .

 (h) <u>Governing Law</u>. This Trust will be construed and enforced in accordance with the laws of the state of Illinois.

*Id.* at 9–10.

 Mr. Tuttle testified that the only disbursements he has made from Trust funds were for his mother's funeral expenses.

## DISCUSSION

 The discharge provided by the Bankruptcy Code is meant to give debtors a financial "fresh start." *In re Chambers*, 348 F.3d 650, 653 (7th Cir. 2003). For many, it is a qualified fresh start, as Congress designated student loans as one of the specific debts excluded from the general discharge. 11 U.S.C. § 523(a)(8). Because such loans are presumptively non-dischargeable, debtors have the burden to show that excepting student loan debts from discharge would impose an undue hardship upon them and their dependents. 11 U.S.C. § 523(a)(8); *In re Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993), citing *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987).

 The *Brunner* test for undue hardship adopted by our Circuit requires a three-part showing by a debtor: (1) that he cannot maintain, based on current income and expenses, a "minimal" standard of living if forced to repay the loans; (2) that additional circumstances exist indicating this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that he has made good faith efforts to repay the loans. *In re Roberson*, 999 F.2d at 1135. Recently, the Seventh Circuit has cautioned against applying this multi-factor test so restrictively as to supersede the language of the statute itself, which requires only "undue hardship." *Krieger v. Educational Credit Mgmt. Corp.,* 713 F.3d 882 (7th Cir. 2013) (warning against allowing "judicial glosses, such as the language in *Roberson* and *Brunner*, to supersede the statute itself," and noting that the phrase "certainty of hopelessness" sounds more restrictive than the statutory term "undue hardship"). The Code does not define "undue hardship," but the statutory text suggests that Congress did not mean to permit "garden-variety" hardship of the

kind accompanying all bankruptcy filings. *O'Hearn v. Educ. Credit Mgmt. Corp.* (*In re O'Hearn*), 339 F.3d 559, 564 (7th Cir. 2003). The debtor bears the burden of proving all three elements by a preponderance of the evidence. *Goulet v. Educ. Credit Mgmt. Corp.*, 284 F.3d 773, 777 (7th Cir. 2002) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)). A debtor who fails to establish any one of the elements does not meet his burden, and consequently, the Court need not proceed with the remainder of the inquiry. *Id.*

### A. Maintaining a Minimal Standard of Living

The first *Brunner* prong focuses on "the debtor's current financial condition to see if payment of the loans would cause his standard of living to fall below that minimally necessary." *Roberson*, 999 F.2d at 1135. This requires showing "more than simply tight finances." *Kehler v. Nelnet Loan Servs. (In re Kehler)*, 326 B.R. 142, 147 (Bankr. N.D. Ind. 2005). Courts consider the debtor's current income and expenses and disregard any unnecessary or unreasonable expenses that could be reduced to allow for payment of debt. *Larson v. United States* (*In re Larson*), 426 B.R. 782, 789 (Bankr. N.D. Ill. 2010); *Educ. Credit Mgmt. Corp. v. Rhodes (In re Rhodes)*, 464 B.R. 918, 923 (Bankr. W.D. Wash. 2012) (finding first prong not met, where, though debtor presently was unemployed, was readily employable.)

On the income side, courts consider all sources of income and revenue streams. *See, e.g., Armstrong v. U.S. Dep't of Educ. (In re Armstrong)*, No. 10-8118, 2011 WL 6779326, at *4 (Bankr. C.D. Ill. Dec. 27, 2011) ("[A]s a general rule, the income of a non-debtor spouse who is not obligated on the educational loans, is material to the analysis."). *See also, Davis v. Educ. Credit Mgmt. Corp. (In re Davis)*, 373 B.R. 241, 248 (W.D.N.Y. 2007) (explaining that the "bankruptcy court must consider debtor's total household income, including not only the income earned by debtor seeking to discharge student loan debt, but income of non-debtor spouse, live-in companion, life partner, or contributing co-habitant."). While *Innes v. Kansas (In re Innes)*, 284 B.R. 496 (D. Kan. 2002), a case cited by Mr. Tuttle, made the point that a court might

only consider the non-student-loan debtor spouse's income necessary for one-half of the household expenses, that rationale has less force here when the decision to keep Tuttle out of the workforce apparently was a joint one.

### 1. Household income.

#### a. Separate potential income stream—the Trust

ECMC argues that funds in the Trust established by Mr. Tuttle's mother should be available to pay Tuttle's student loans. Tuttle disagrees, arguing that the purpose of the Trust is educating his offspring, and that none of the corpus is available for his personal use or is part of the bankruptcy estate. ECMC asserts that the plain language of the Trust directs the trustee to distribute the Trust property to Tuttle, such that the $38,000 corpus can be used to repay his student loans.

Courts interpret trust agreements as they do other contractual provisions in written agreements. "[C]ourts construe terms in trust agreements without deferring to either party's interpretation." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112 (1989); *Storkan v. Ziska*, 406 Ill. 259, 263, 94 N.E.2d 185 (1950). The Trust itself provides that it should be interpreted under Illinois law. CM-ECF Doc. No. 59-2, at 10 (Exhibit 101, Sec. 10(h)). Illinois courts, when interpreting trusts, look to the settlor's intent, which the court will effectuate if it is not contrary to law or public policy. *Citizens Nat'l Bank of Paris v. Kids Hope United, Inc.*, 235 Ill.2d 565, 574, 337 Ill. Dec. 516, 922 N.E.2d 1093 (2009). "When the language of the document is clear and unambiguous, a court should not modify or create new terms." *Ruby v. Ruby*, 2012 IL App (1st) 103210, ¶ 19, 362 Ill. Dec. 261, 973 N.E.2d 361. A court examines the plain and ordinary meaning of the words used in the instrument within the context of the entire document. *Id.* ¶ 24.

ECMC points to the following single excerpt as evidence of the settlor's intent to make Trust funds available to Mr. Tuttle himself:

> Subject to the creation of any subtrusts, on the death of the Grantor, the trustee shall allocate or distribute the remaining Trust Property to the beneficiaries . . .

      1)   Name: Dylan Frey Tuttle
               Percentage: 100%

CM-ECF Doc. No. 59-2, at 6 (Exhibit 101, Sec. 6(b)).  ECMC contends that the debtor "does not point to a specific provision of the Trust that would support his position . . . ."  ECMC cites no Illinois authority for interpreting trust agreements, and does not address other provisions of the Trust document.

Mr. Tuttle, in his reply, points to Section 6 of the Trust agreement for his assertion that he is only a residuary beneficiary and that the funds are to be held for his mother's grandchildren's education.  Tuttle agrees that he has not formally created a subtrust for his son, but argues that his son is a beneficiary under Sec. 6(b)(1):

> If such beneficiary is not then living, that share of the Trust Property that would have been given to such beneficiary will be distributed to Dylan Frey Tuttle's children then living in equal shares.

In his reply brief, as he did in his trial testimony, Tuttle also points to Section 8(a)(1):

> The Trust Property distributed to Dylan Frey Tuttle will be retained in trust and held in a separate subtrust of the Trust until: Dylan Frey Tuttle's death.

Tuttle, like ECMC, cited no caselaw for interpretation of the Trust agreement.

On review of the document, the Court considers that the language is plain.  The Trust document provision about beneficiaries must be read in context with the document as a whole.  *Ruby*, ¶ 24.  Even if there were ambiguity, different sections should be read in harmony, reading no provision as surplusage.  *Harris Trust & Savings Bank v. Beach*, 118 Ill. 2d 1, 3, 112 Ill. Dec. 224, 513 N.E.2d 833 (1987); *Mucci v. Stobbs*, 281 Ill.App.3d 22, 29, 216 Ill. Dec. 882, 666 N.E.2d 50 (1996).

Here, the Trust language manifests the settlor's intent to use the trust funds, after payment of expenses related to her death and remaining bills, for the education of her grandchildren.  Section 6, which makes Mr. Tuttle a 100% beneficiary is qualified by Section 8, which requires that any property

distributed to him be retained in trust until his death. The plain meaning is that any funds designated to Tuttle, not previously allocated to subtrusts specifically identified for the benefit of Tuttle's children, are for the benefit of his heirs only. This reading also is supported by Section 4(b) which makes Madison Zuverink, Tuttle's wife and mother of his child, the successor trustee. (In other words, all the provisions of the Trust document are directed for the care of Tuttle's issue.) Further support for the interpretation that Tuttle does not financially benefit from the trust corpus, is that the Chapter 7 panel trustee was aware of the Trust document, held two section 341 meetings with the debtors, and still issued a no asset report. *See* Case No. 16-28259, CM-ECF Doc. No. 1, at 19; *Burciaga v. Moglia*, No. 18-0212, 2019 WL 1313398, at *2 (Bankr. N.D. Ill. March 22, 2019) (explaining that property of the bankruptcy estate is broadly defined by the Code, encompassing all legal or equitable interests of the debtor in property); *In re Fox*, No. 03-60547, 2011 WL 10468085 (Bankr. N.D. Ill. March 16, 2011) (acknowledging that, while not controlling, the trustee is invested with a great deal of discretion as to the exercise of his or her business judgment in determining how to administer or pursue assets).

Finally, to the extent the Trust document could be read as ECMC suggests, to allow Mr. Tuttle to distribute funds for his own benefit rather than the benefit of his children, Tuttle's power to do so is limited. He would be able to make distributions in an amount he deems necessary "for [his] health, education, maintenance, and support." This limitation cannot be read to allow payment for debt service (particularly for obligations Tuttle incurred before the Trust was established).

For all these reasons, the Court will not consider the availability of the Trust income (and Tuttle's retention of that income for the benefit of his children rather than repayment of his student loans) as part of his revenue stream.

### b. Wages

A minimal standard of living includes sufficient expenditures "for basic necessities such as food, shelter, clothing and medical treatment" as well as a small allocation for discretionary or recreational purposes. *Larson*, 426 B.R. at 789. A debtor need not live in abject poverty to satisfy this element. *Id.* A debtor, however, must make significant efforts to "live within the strictures of a frugal budget for the foreseeable future." *Id.*

ECMC points to *Lepre v. Dep't of Educ. (In re Lepre)*, 466 B.R. 727, 732 (Bankr. W.D. Pa. 2012), *aff'd* 530 Fed. Appx. 121 (3d Cir. 2013), to urge that the Court should not "accept the debtor's income and expenses listed on his schedules at face value," but rather the Court has a duty to ensure that "the income and expenses 'reflect a true picture of the debtor's financial situation.'" Under *Lepre*, this would include a review of the debtor's bank statements and other financial records. But ECMC did not introduce any of those bank statements—which Mr. Tuttle provided in discovery, *see* CM-ECF Doc. No. 72 at 3—into evidence (as the defendant in *Lepre* did), and nothing otherwise adduced at trial leads the Court to conclude that Tuttle failed to try to account for all his income and expenses via his original schedules filed under penalty of perjury and his trial testimony about the adjusted expenses, after their child was born, as set out on Exhibit 6. Without shifting the evidentiary burden to ECMC, the Court considers that Tuttle's schedules and testimony about expenses are entitled to due weight. The particulars are discussed below.

The annual federal poverty income guidelines for a family of three in 2018, total $20,780. The guidelines provide a starting point by which to measure a debtor's financial situation. *Gesualdi v. Educ. Credit Mgmt. Corp. (In re Gesualdi)*, 505 B.R. 330, 340 (Bankr. S.D. Fla 2013). Exhibit 47.

The debtors' Schedule I showed a monthly net income of $1,424.65. But Mr. Tuttle testified that his home business is not operating, so it should not be incurring expenses and thus he should not be taking a $231.28 loss on those expenses. In addition, Schedule I did not prorate the tax refunds their household received, which would have been about $540.01 per month. A

number of courts consider debtors' tax refunds as part of the applicable income stream. *Riendl v. Educ. Credit. Mgmt. Corp. (In re Riendl),* No. 02-C-0228-C, 2002 WL 32150420, at *2 (W.D. Wis. June 14, 2002) (adjusting debtors' monthly income by adding one-twelfth of their tax refunds for prior year); *Piccinino v. U.S. Dep't of Educ. (In re Piccinino),* 577 B.R. 560, 564 (B.A.P. 8th Cir. 2017) (finding it appropriate for bankruptcy court to include a portion of debtor's tax refund as part of her monthly income in its undue hardship analysis). Adding in the prorated refunds, the effective 2016 net monthly income on Schedule I should be regarded as $2,196.04. As ECMC acknowledged, the debtors' income at the time of filing was "tenuous." CM-ECF Doc. No. 77 at 22.

Mr. Tuttle projected his spouse will be making (or likely is already earning this Spring semester) C$40,000 - C$45,000 annually in her fellowship. Converting to U.S. dollars, the projected average would be $31,204 per year. Allowing a 20% reduction for federal income tax and other withholding, Ms. Zuverink's average monthly take-home would be approximately $2,080.00. That amount is 120% of the poverty guideline. Mr. Tuttle testified that after the fellowship, Ms. Zuverink will seek full-time employment as a microbiologist. The Court finds that the household income is likely to increase beyond the $2,080/month at least by year 2021, solely due to Ms. Zuverink's profession. But assessing present income only, against the expenses described below, Mr. Tuttle's household cannot meet a minimal standard of living and make payments on his student loans.

### 2. Household expenses

ECMC argued that Exhibit 7, the U.S. Department of Labor survey of average annual expenditures by households of three, was not targeted at the Milwaukee region and therefore should not be accepted to support Mr. Tuttle's revised schedule of expenses. On further review of that survey, the Court agrees that it holds little persuasive value. Not only do the survey tables fail to narrow the data by region of the country, but footnote 1 states "data are likely to have large sampling errors" and footnote 2 "value is too small to display,"

and these footnotes appear on multiple entries under the column pertaining to the debtor's 2018 household income.

Overall, ECMC argues that the claimed expenses fail to reflect "belt-tightening" required by *Brunner* and its progeny. *In re O'Hearn,* 339 F.3d at 566 (to meet the first prong, a debtor must manifest he is making major personal and financial sacrifices, and not merely sustaining "garden variety hardship"). Mr. Tuttle argued that reducing the expenses assailed by ECMC would still show a deficit in his family's budget, citing *In re Innes*, 284 B.R. 496 (D. Kan. 2002). If Ms. Zuverink remains the only income-earner in the household, then the Court agrees with Mr. Tuttle's math.

ECMC criticizes the debtor's monthly healthcare expense of $258.10, shown on Exhibit 6. Mr. Tuttle says this includes co-pays, deductibles and other non-insured expenses. The Court accepts that amount, in part because Tuttle's argument that ancillary benefits, like WIC, Badgercare and Froedtert health assistance which Ms. Zuverink received while a research assistant, will no longer be available to the family when they relocate for Ms. Zuverink's fellowship. Church assistance, however, is likely to be equally available if needed.

Next, ECMC criticized the $262.53 category for electronics and merchandise on Exhibit 6, but Mr. Tuttle testified that amount included second-hand clothing for his wife and child, and there is no other line item for clothing. He did not explain the electronics portion of that line item, but specifies other amounts for cable, services and supplies and utilities. The Court concludes that he has failed to identify what "electronics" are and so reduces that amount to $130.00. Likewise, Tuttle failed to identify the nature of the line item "other expenses" in the amount of $172.26, other than to say it was a category from his bank's online tool. But he did not offer bank statements into evidence, and it is the debtor's burden to be specific. *Nelsen v. Educ. Credit Mgmt. Corp. (In re Nelsen),* 404 B.R. 892, 895-96 (Bankr. E.D. Wis. 2009) (debtor's burden to identify his problems, in undue hardship analysis). Without a description, the Court must discount that expense.

With regard to transportation expenses, as noted above, the Court does not accept the survey contained in Exhibit 7, and so instead of the $148.08 shown on Exhibit 6, the Court accepts the expense for transportation costs in Schedule J, line 12 of $65. The Court agrees with Mr. Tuttle that the $527.34 expense for Weestack can be eliminated. The Vulkans Forge business has not been functioning since at least late 2015, and, contrary to his August, 2016 notation on Schedule I that "home business should be cash flow positive within a year," the debtors' 2017 tax returns showed a $3,000 loss for Weestack. Essentially, it, too, is not functioning.

While the debtors do not live extravagantly, cases interpreting sec. 523(a)(8) require "belt-tightening" so that taxpayers are more likely to recoup their investment in student borrowers. Accordingly, the Court finds $194.94 in monthly entertainment, restaurants and travel expense to surpass the "belt-tightening" required, and should be reduced to $100.00. The Court also finds that $523.95 per month for groceries, for a healthy family of 3, is high relative to what other debtors in this district manage, and should be reduced to $424.00.

With these reductions, monthly expenses on Exhibit 6, for Mr. Tuttle's household of 3, total $2,100.62. Those expenses are below the adjusted Schedule I income of $2,196.04 (reflecting prorated tax refunds and no business expense loss), by $96.42. This is a very strict budget. It may not include a health insurance premium. And, as of the date of trial, Tuttle could not maintain a minimal standard of living and still make his loan payments. Mr. Tuttle's testimony that his wife would be working in her fellowship several months after trial, at a projected average monthly salary of $2,080, does not mean an income increase for her in the near term, and could mean a decrease.

ECMC argues under the first *Brunner* prong that Mr. Tuttle has failed to maximize his income, and some courts analyze that factor at this point. *See, e.g.*, *Butler v. Educ. Credit Mgmt. Corp. (In re Butler)*, No. 14-07069, 2016 WL 360697 *4-5 (Bankr. C.D. Ill. January 27, 2016) (finding first *Brunner* prong not met, after assuming 44-year-old debtor could find a job in near future,

where she had no significant health needs, no dependents, a willingness to take positions in a variety of fields, even though she had a history of several periods of unemployment and underemployment throughout her career); *Bukovics v. Navient (In re Bukovics),* 587 B.R. 695, 705-06 (Bankr. N.D. Ill. 2018) (noting that debtors are expected to cast a wide net to maximize their income, plaintiff who had applied for eight to ten jobs over past several years did not identify type and quality of positions); *Armstrong v. U.S. Dep't of Educ. (In re Armstrong),* No. 10-8118, 2011 WL 6779326 *5 (Bankr. C.D. Ill. Dec. 27, 2011) (addressing maximization of income as part of first *Brunner* prong); *Brosnan v. American Educ. Servs. (In re Brosnan),* 323 B.R. 533, 538 (Bankr. M.D. Fla. 2005) (applying first prong of *Brunner* test to conclude that lawyer who worked only 10 hours per week, and did not demonstrate she was unable to secure employment in other fields, failed to show she had maximized her income). Their analysis of individual debtors' circumstances is useful, but according to the Seventh Circuit, that factor should come into play in the third prong. *In re Roberson,* 999 F. 2d at 1136 ("upon debtor's satisfaction of the first two requirements for discharge . . . the student assumes an obligation to make a good faith effort to repay those loans, as measured by his or her efforts to obtain employment, maximize income, and minimize expenses); *see also, In re Carter,* 517 B.R. at 876-78 (applying maximization of income to the third prong, good faith analysis of *Brunner*). Therefore, this Court will assess Mr. Tuttle's job-search efforts later in this decision.

Because the Court concludes that Mr. Tuttle cannot at present maintain a minimum standard of living and still make his loan payment, he has satisfied the first prong of the *Brunner* test. Accordingly, the Court proceeds to address the other two queries of the *Brunner* undue hardship analysis.

### B. Additional Circumstances That Show Inability to Pay Will Persist

The second *Brunner* prong asks whether additional circumstances exist that would indicate that Mr. Tuttle's inability to pay is likely to persist for a significant portion of the repayment period. *Tetzlaff v. Educ. Credit Mgmt.*

*Corp.*, 794 F.3d 756, 759 (7th Cir. 2015). The Seventh Circuit has explained that student loan discharges should be based on a "certainty of hopelessness" requiring evidence "of additional exceptional circumstances, strongly suggestive of continuing inability to repay." *Goulet*, 284 F.3d at 778, 779 (internal citation omitted). Factors that can be considered include the debtor's age, education, job skills, employment history, any significant physical or psychiatric impediments to securing employment, the size of the debt, and whether the debtor has any dependents. *See Krieger,* 713 F.3d at 884-85 (bankruptcy court did not err in concluding that the second *Brunner* prong was met when the 53-year old debtor lived in a rural area with few jobs, lacked the resources to travel in search of employment elsewhere, applied unsuccessfully for about 200 jobs over a ten-year period, and had not held a job since 1986). Dischargeability of student loans should be based upon the "certainty of hopelessness" for a significant portion of the loan repayment period, not simply a present inability to fulfill financial commitment. *Roberson*, 999 F.2d at 1136 (citing *In re Briscoe*, 16 B.R. 128, 131 (Bankr. S.D.N.Y. 1981)).

To show that a debtor's state of affairs is likely to persist, "a debtor must precisely identify his problems and explain how his condition will impair his ability to work in the future." *In re Nelsen*, 404 B.R. at 895-96 (concluding that neither debtor's age of 57, nor difficulty caused by business downturn due to slow economy, qualified as "additional exceptional circumstances"); *Vargas v. Educ. Credit Mgmt. Corp. (In re Vargas)*, No. 10-4022, 2010 WL 5395142, at *5 (Bankr. C.D. Ill. Dec. 22, 2010) (debtor's only identified problems were his age of 57 and lack of desire to obtain employment other than at the Salvation Army, despite previous work as a CNA, and bachelor's degree in journalism "that was of no use to him"—not insurmountable for second *Brunner* prong).

To the extent Mr. Tuttle argues that being 46 years old is an "exceptional circumstance" equating to unemployability and a persistent inability to pay, the Court rejects that argument. He makes that argument without evidence that the jobs which he is capable of performing or seeking require the physical abilities of a younger person. And the caselaw undercuts his argument as well.

*See, e.g., Rosen v. Attorney Reg'n. and Discip. Comm'n (In re Rosen)*, No. 16-C-10686, 2017 WL 4340167, at *1, 9 (N.D. Ill. September 29, 2017) (addressing first *Brunner* prong, debtor obtained multiple degrees and multiple student loans over 37 years, was unemployed lawyer and CPA receiving social security who failed to maximize his income); *Carter v. Sallie Mae (In re Carter)*, 517 B.R. 870, 876-78 (Bankr. N.D. Ill. 2014) (addressing third *Brunner* prong, 52-year-old debtor, single mother with one child, with three graduate degrees and non-native English speaker, failed to maximize income); *In re Gesualdi*, 505 B.R. at 343-44 (applying second *Brunner* prong, 46-year old debtor with multiple degrees, relatively healthy, primary caregiver for couple's child, not precluded from finding a position in another field). *See also, Spence v. Educ. Credit Mgmt. Corp., (In re Spence)*, 541 F.3d 538, 544 (4th Cir. 2008) (finding no "additional circumstances" outside of normal hardships faced by bankruptcy petitioners that would render debtor's situation hopeless, who was 62 years old and had low-paying job).

Next, Tuttle argues that two aspects of his work history are impediments to hiring—prior lack of advancement and lack of supervisory experience. But Tuttle provided some reasons for those gaps to the Court, and could likewise offer those explanations to potential employers, which seem to boil down to changes in technology, unwillingness to assume more debt, and an entrepreneurial spirit. Those are hardly disorders or character flaws. *See also, In re Carter,* 517 B.R. at 876-77 (declining to find debtor's prior terminations for "argumentative personality" as "additional circumstances" equating to a persistent inability to pay her student loan debt).

Overall, the Court found Mr. Tuttle fully capable of effectively communicating his position and he was very well-organized in his presentation of legal arguments. There is no basis to conclude that, with his advanced degree, sophisticated work history, and capable, *pro se* presentation, Mr. Tuttle lacks marketable job skills. *See Tetzlaff,* 794 F.3d at 759-60 (finding debtor had ability to improve his financial situation, given he had an MBA, is a good

writer, is intelligent, and family issues were largely over; also noting that his "capable *pro se* representation is . . . an indicator of his marketable job skills").

The Court is not persuaded that Mr. Tuttle's unemployment will continue indefinitely. Full-time, or even reasonable part-time, work is likely available to Mr. Tuttle, even if not the type of work he prefers, that would provide income to pay his student loan obligation. *See, e.g., In re Gesualdi*, 505 B.R. 330 (Bankr. S.D. Fla. 2013) (finding for 46-year old debtor, with multiple degrees, relatively healthy but with some limitations, married and with one child for whom he is the primary caregiver, that situation was "not hopeless" because it was likely to improve when his son began school, wife was working full-time, and debtor was not precluded from finding a position in another field). At the time of trial Tuttle and his family lived in an urban area, and he testified that his wife's fellowship opportunities are also in an urban area. This means an expanded array of employment opportunity for Tuttle's search, possibly exploiting his finance background, his workforce development experience, his researching ability, his experience as a grant-writer/professional writer, or a trainer. He has an undergraduate and a graduate degree. True enough, he will need to find employment to a degree that covers his loan payment and childcare at least until their child or children are in school, or work that is on an alternating shift from that of his wife. His explanation at trial for why he was not hired during the six-week period in 2015-16 when he looked for work was lacking in detail, as was the reason why his own entrepreneurial efforts failed. He testified to his conclusion "there is no career or good job for me to return to when our children reach school age," but again, the lack of specificity undermines the argument.

Mr. Tuttle cites *In re Walker,* 650 F.3d 1227 (8th Cir. 2011), but the Eighth Circuit follows a totality of circumstances analysis. Even so, the facts in *Walker* creating a persistent inability to pay are starkly distinguishable. There, the debtor and her husband had five children, including twins with autism who required intensive at-home therapy and enough hours of parental involvement in that therapy that essentially equated to a full-time job. Even

looking ahead a few years to when the therapy hours would lessen, the *Walker* court appeared to view parenting of five children, including two with special needs, and even though debtor's husband worked two jobs, as a persistent, additional circumstance strongly suggestive of a continuing inability to repay. 650 F.3d at 1232-34. Notably, the concurrence in *Walker* skeptically points to some family expenditures not reflective of proper minimizing of expenses to sustain an "undue hardship" burden. *Id.* at 1235.

In support of his argument for unemployability due to childcare duties, Mr. Tuttle explained that he and his wife had their first child in December, 2016. Apparently together they decided that it would be more "cost-effective" for him to provide childcare, instead of gaining outside employment. Tuttle asserted that monthly childcare for an infant in his area cost $997, Exhibit 48. Another court in our Circuit rejected a debtor's choice of staying home to provide childcare as a basis for seeking discharge of her student loans, when full-time work was very likely available to her. *Wessels v. Educ. Credit Mgmt. Corp.*, 271 B.R. 313, 315 (W.D. Wis. 2002). To the extent that Tuttle's mother's illness in 2016 was a special circumstance taking him out of the workforce, that circumstance did not create a "persistent inability" to pay his student loan debt.

Another factor Mr. Tuttle points to for inability to pay is that he considers himself of "low-income family background." He relies on research comparing low-income college graduates' earnings peaks to that of higher-income graduates' earnings peaks, as well as relative likelihoods of educational loan defaults or deferments between those two groups. *See* CM-ECF Doc. No. 72, at 7 et seq., Exhibit 22. Tuttle testified that his "work history is consistent with college graduates from low-income backgrounds" and that this concept was relevant to his decision to leave the workforce and care for his child. Tuttle may or may not have a profile, like innumerable others, that fits the "low-income background" of the research he cites. But that broad descriptor cannot replace the discrete individual characteristics recognized by *Goulet* and *Krieger*, such as lack of job skills, or significant physical or psychological

impediments.  Sweeping categorization and arguable predictors may be useful in policy arguments to legislators, but courts in this Circuit are tasked with applying sec. 523(a)8 to a single debtor's specific circumstances, as manifested by admissible evidence before it.

Last, Mr. Tuttle makes another policy argument.  He urges that the second *Brunner* prong should not apply when the borrower's repayment burden is not commensurate with his projected ability to pay, because the servicer approved deferment and consecutive forbearances for years, instead of offering the debtor an income-sensitive repayment schedule.  He argues that his principal balance of 160% of the borrowed amount, in spite of having made 104 payments, is a clear indication that his repayment burden is not commensurate with his ability to pay.

But this argument places the burden on the lender, not the borrower.  As the *Roberson* court teaches, the debtor must accept the consequences of his decision to borrow.  999 F.2d at 1137.  "If the leveraged investment of an education does not generate the return the borrower anticipated, the student, not the taxpayers, must accept the consequences of the decision to borrow." *Id.*

Mr. Tuttle so far has declined to re-consolidate his current loan and enter into any new ICRP, IBR or REPAYE program.  Now that this adversary proceeding is concluding, he may view things differently.  One of those options, even though it establishes a longer payment duration, could allow for reduced payment in the near term, while Tuttle looks for work and a greater payment after Tuttle's income increases once he obtains employment, as well as after his child/children are school-age and childcare costs decrease.  Presumably his wife's income also will increase when her fellowship concludes.  Whether or not Tuttle refinances, a consideration of the taxability of forgiveness of the loan balance at the end of term is premature.  *Gesualdi,* 505 B.R. at 346.

Mr. Tuttle has failed to present evidence of insurmountable circumstances making him unable to pay his student loan debt for the remainder of the payment period.  Having earned a bachelors degree, and a

Master's degree from the London School of Economics, Tuttle has a substantial education. And, although he has had some difficulty maintaining employment in the past, he has a history of sophisticated work, self-direction and creativity. Nonetheless, Tuttle cites his age, his "low-income background," and lack of supervisory experience as barriers to employment and means to repay his loans. None of these circumstances appear exceptional or indomitable, *see In re Carter*, 517 B.R. at 877, and so do not meet the "certainty of hopelessness" standard required by the second *Brunner* prong. Even setting aside any "gloss" of that phrase, given all of the debtor's positive attributes, experience and years of work life ahead, Mr. Tuttle has not established an inability to pay that is likely to continue for the foreseeable future.

### C. Good Faith Efforts to Repay

Last, to obtain a discharge of student loan debt, a debtor must demonstrate that he "made good faith efforts to repay the loans." *Roberson*, 999 F.2d at 1136. A debtor's good faith efforts to repay his student loans are measured by his ability to "obtain employment, maximize income, and minimize expenses." *Tetzlaff,* 794 F.3d at 760, quoting *Roberson*, 999 F.2d at 1136. Actual repayment achieved is also a consideration. Debtors are not penalized for failing to make student loan payments when they lacked the ability to do so. *Clark v. U.S. Dep't of Educ. (In re Clark)*, 341 B.R. 238, 255 (Bankr. N.D. Ill. 2006). What matters for the good faith prong is that the debtor was not willful or negligent in bringing about his unfortunate financial condition. *Id.*

#### 1. Efforts to make payments.

Mr. Tuttle paid his $5,000 Perkins loan by August, 2000. He consolidated his Stafford loans in 2001, and in the 17 years since then, has taken deferments totaling almost 7 and one-half years because of his professed inability to make payments. As a consequence of delaying payments on principal, interest has accrued and become capitalized. Tuttle points out that he has made over 100 months of payments (about 8 and one-half years) and

has avoided default.  But obtaining a deferment does not necessarily evidence good faith, when it is not followed by payment or a significant effort to work out a payment schedule.  *In re Gesualdi*, 505 B.R. at 345. The cases require not only an effort to make loan payments but also sufficient effort to obtain employment, maximize income and minimize expenses.  *Goulet*, 284 F.3d at 779.  Repaying the Perkins loan within three years of receiving his graduate degree is a positive; taking deferments and forbearances for almost half of the next fifteen years without achieving a significant employment change to increase income is not.  It is a closer call whether Tuttle should have "gotten real" and moved on to some work for an employer that would allow him to make the loan payments.

### 2. Efforts to maintain/obtain employment.

Another sign of good faith is that after Mr. Tuttle consolidated the Stafford loans, he enrolled in additional college credits to improve his employment prospects, and did not borrow for those additional credits.  Exhibit 42.  Mr. Tuttle testified that he drove a cab for a while in 2006, after taking the severance package from the trading company.  His tenure with the workforce development agency lasted several years, but in 2011 or 2012 he decided against finding another employer and started his own business.  He received a start-up grant, but over the course of three years his business did not catch fire.  He spent six weeks between late 2015 and early 2016 looking for employment but did not describe those efforts in any detail.  *Compare, In re O'Hearn*, 339 F.3d at 566 (debtor contacted more than 500 employers in different fields before landing his present position); *Walker v. Sallie Mae Servicing Corp. (In re Walker)*, 650 F.3d 1227, 1234-35 (8th Cir. 2011) (in a totality of circumstances analysis, debtor, a school psychologist and mother of five, including twins with autism, was not underemployed or unemployed "for no discernible reason" because caring for her five children had become a full-time occupation where she had to be present for 24-43 hours of intensive in-home therapy for her autistic children).

No doubt Tuttle desired to help his mother in her illness and, like many people, he and his wife preferred that a parent be the care provider for their child, almost a year later. He did not testify to looking for second-shift jobs, for example, such that outside childcare could be avoided or minimized.

But student loan debtors do not always have the luxury of leaving the workforce. As the Seventh Circuit has explained, "it is not uncommon for individuals to take jobs not to their liking in order to pay off their student loans, or for that matter to meet all sorts of other financial obligations." *In re O'Hearn*, 339 F.3d at 566; *In re Brosnan*, 323 B.R. at 357 (ruling that debtor, a lawyer, did not maximize her income where she did not show she was unable to secure employment in other fields); *In re Carter*, 517 B.R. at 878 (debtor offered no hard evidence to establish she was conducting a truly diligent and sustained job search, or that her inability to find full-time employment in the future is likely to persist indefinitely); *Wessels*, 271 B.R. at 315 (preference for stay-at-home childcare does not support undue hardship when employment is available to debtor). Tuttle's effort to obtain employment has not been as aggressive or focused as it should be, which culminated in a withdrawal from the workplace and a failure to maximize income. His state of under- or unemployment appears largely due to personal choice. Compare his Schedule J statement of August, 2016 "the home business should be cash flow positive within a year" with Exhibit 41 showing $0 income for Tuttle in 2016 and 2017 tax return showing a $3,000 loss for the home business. Instead, he should be more proactive about securing employment, now that his child is out of infancy and he no longer must care for his mother. *See Weissman v. American Educ. Servs. (In re Weissman)*, No. 06-50108, 2008 WL 2705559, at *4 (Bankr. S.D. Ind. July 9, 2008) (debtor, with cerebral palsy but capable of working full-time, cannot remain underemployed in an effort to discharge her student loans.)

Beyond Mr. Tuttle's lack of evidence about his job search, the Court can take judicial notice of publicly available data, such as labor statistics, and notes that in January of 2016 when Tuttle ended his search, the Wisconsin unemployment rate was at a low 4.3 percent. By the time of trial in late

summer, 2018, that unemployment rate had fallen to 3.0. In short, Wisconsin employers have been looking for workers. *See* Bureau of Labor Statistics, Databases, Tables & Calculators by Subject, Local Area Unemployment Statistics, available at https://data.bls.gov/pdq/SurveyOutputServlet; *Jackson v. Nassau County Civil Serv. Comm'n*, 424 F. Supp. 1162, 1166 n.6 (E.D.N.Y. 1976) (taking judicial notice of local job market conditions which compelled young college-educated workers to look for positions in field they would not have considered in better economic times); *U.S. v. United Broth. of Carpenters and Joiners of America, Local 169*, 457 F.2d 210 (7th Cir. 1972) (taking judicial notice of statistical data from Bureau of the Census).

In order to maximize income, a debtor must show he is unemployable in other fields. The evidence Mr. Tuttle offered is insufficient to make this showing. The Court must conclude that the debtor has not satisfied the good faith prong of *Brunner*.

**CONCLUSION**

For all these reasons, debtor Dylan Tuttle has not met his burden of establishing that repayment of his student loans would impose an undue hardship under 11 U.S.C. § 523(a)(8). Judgment will be is entered in favor of the defendant ECMC and against the plaintiff Mr. Tuttle. A separate order concurrent with this written decision will be issued.

Dated: March 31, 2019

By the Court:

Beth E. Hanan
United States Bankruptcy Judge